Filed 1/3/22  P. v. Messer CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(El Dorado)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>JOSEPH RAY MESSER,<br><br>　　　　Defendant and Appellant. | C092917<br><br>(Super. Ct. No. P19CRF0192) |

Defendant Joseph Ray Messer, who was homeless, sought to pressure the victim, his ex-girlfriend, into loaning him a camper shell for his truck.  When she refused, defendant, while possessing a knife, threatened to slit her throat and kill everyone who lived in her house.  The victim, who knew that defendant previously had been convicted of voluntary manslaughter, was very scared and called 911.  When the police arrived, she

1

requested an emergency protective order and signed a citizen's arrest form. Defendant subsequently violated the emergency protective order by calling the victim from jail after his arrest.

After a jury trial, defendant was convicted of making criminal threats (Pen. Code, § 422—count 1)[1] and misdemeanor disobeying a court order (§ 166, subd. (a)(4)—count 3). The jury found not true the allegation that defendant personally used a knife in the commission of count 1. Following the jury's verdict, defendant admitted two prior strike convictions (§ 667, subds. (b)-(i)) and two serious felony conviction allegations (§ 667, subd. (a)(1)). After denying defendant's *Romero* motion (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*)) to dismiss the prior strike convictions, the court sentenced defendant to an aggregate term of 35 years to life for count 1, plus a concurrent 30-day jail sentence for count 3.

On appeal, defendant contends there is insufficient evidence to support his conviction for criminal threats, and that the trial court abused its discretion in denying his *Romero* motion. He also argues that the trial court erred in imposing various fines and fees without first determining his ability to pay as required under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), and that Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assembly Bill 1869), effective July 1, 2021, eliminated the probation report fee imposed in this case. We conclude that only the final contention has merit. Thus, we modify the judgment to vacate the probation report fee, and otherwise affirm the judgment.

BACKGROUND FACTS AND PROCEDURE

A.     *Responding officers' testimony*

On the morning of May 7, 2019, Deputy Sheriffs Patrick Rude and David Isham responded to a 911 call regarding possible domestic violence and brandishing of a

---

[1]     Undesignated statutory references are to the Penal Code.

2

weapon at the victim's residence. When they arrived at the scene, they contacted the victim, who explained that she had been in a romantic relationship with defendant but they had recently broken up. The victim said that defendant had come to her house that morning to ask to use her camper shell. Although she asked defendant to leave, he instead followed her inside the house and back to her bedroom where they began to argue about the camper shell. When she refused to give him the camper shell, he became angry and threw a soda against the wall. He then held up an open pocketknife, threatened to slit the victim's throat and kill everyone who lived in the house.

The victim told the officers that in response to defendant's threats, she began to push defendant down the hallway toward the front door. As she was doing so, defendant grabbed her by the throat, pinned her against the wall, and pushed her face against the wall. Defendant said something to the effect of, "[Y]ou better recognize who you're talking to." The victim's friend, Michele S., tried to intervene, but defendant warned her, "You'll be next." Defendant then released the victim and left the house. Once outside, defendant threatened to slice the tires on the victim's vehicle with his knife, which was still in his hand. After that, defendant got in his truck and left.

Deputy Rude spoke to the victim about an emergency protective order, and the victim said she wanted one. The victim told Deputy Rude that she feared for her life and the lives of her children after defendant had threatened "to cut her throat" and "kill them." The victim was not reluctant to get a protective order and never said she did not want or need one. The victim also voluntarily signed a citizen's arrest form to have defendant arrested.

Although the victim did not have any visible injuries, Deputy Rude testified that the victim reported pain in her face and head. Deputy Rude described her demeanor as "calm and collected," but he testified that this was not necessarily unusual for a domestic violence victim.

Deputy Rude also interviewed the victim's friend, Michele. Michele's account was essentially the same as the victim's: defendant followed the victim into the house; defendant refused to leave when asked; defendant and the victim began arguing; defendant became angry, threw a soda bottle, brandished an open knife, and threatened to slit the victim's throat; the victim pushed defendant down the hall and defendant pinned her against the wall; Michele tried to intervene but defendant told her to "get away" or she would be "next," so she left the house.

The victim had a security surveillance video camera at her home that monitored the driveway and front door. The camera recorded the incident and both Deputy Rude and Deputy Isham watched the video. The recording showed defendant entering the house, remaining inside for about 20 minutes, and then coming back outside and making gestures as if to "punch" the victim's tires, before walking to his own vehicle and leaving.

On May 15, 2018, Deputy Rude contacted the victim again. At that time, the victim told him that she no longer wanted to prosecute defendant. Rude was surprised because on the day of the incident, the victim "was adamant that [defendant] was trying to kill her." However, he acknowledged that it is not uncommon for domestic violence victims to have a change of heart.

B.     *The victim's testimony*

The victim testified that she had known defendant for about a year and was in a romantic relationship with him for about six weeks. She ended the relationship in April 2019 after defendant disclosed that he previously had been in jail for killing someone in self-defense. Although she had never felt uncomfortable around defendant, his criminal history made her concerned for her safety and she did not want defendant around her children.

The victim testified that even after she ended their relationship, defendant continued to call her and come to her house. She testified that he "wasn't really taking no

4

for an answer." On one occasion, defendant drove to her house uninvited and told her that he was going to sleep in his vehicle in her driveway. When defendant refused to leave, she allowed him to come inside and sleep on her couch because she did not want her parents, who lived down the street, to see defendant sleeping in her driveway.

On the evening before the incident, defendant called the victim and asked to use her camper shell for his truck. Defendant was homeless and wanted it for shelter. The victim was sympathetic but refused to give him the camper shell because she knew it would not fit his truck. When defendant kept insisting, she became annoyed and told defendant to stop calling and that she was about to leave. Defendant then revealed that he was waiting at the end of her street and if she tried to leave, he would follow her. This made her uncomfortable.

Around 8:30 the next morning, the victim heard defendant outside her house. When she went outside, defendant asked for the camper shell. She did not respond, but turned, went back inside, and walked down the hallway to her bedroom where her friend, Michele, was sitting on the bed.

Defendant followed the victim into her bedroom and asked her again about the camper shell. After returning some belongings that defendant had left at her house, including a small pocketknife, the victim told defendant that the camper shell would not fit his truck. They began to argue, and the victim told defendant he needed to leave. Defendant became angry and threw a soda bottle at the bedroom wall.

At this point, the victim's trial testimony began diverging significantly from her initial statement to the responding officers. According to the responding officers, the victim stated that after defendant threw the soda bottle, he held up an open knife and threatened to slit the victim's throat and kill everyone who lived in the house. The victim, in contrast, testified that after defendant threw the soda bottle, she "flipped out" and began pushing defendant down the hallway, trying to force him to leave. She testified that although she was punching and cursing defendant, defendant was not

5

punching or cursing her. However, at some point, defendant pushed her up against the wall and told her that he would "hurt [her]" and her family "if [she] didn't stop." The victim could not recall if defendant had a knife in his hand when he made the threat, but she denied defendant ever held an open knife up to her face.

The victim testified that defendant's threat made her very upset and scared. When defendant went outside, she grabbed her phone and called 911. The police arrived about 10 minutes later. Michele stayed with her while she waited for the police to arrive.

During the 911 call, the victim went outside to check on defendant and realized he had not yet left her property. She told defendant to leave. As he walked past her truck, defendant told her he was going to "pop" her tires and gestured at her tires. Defendant then got in his truck and drove away.

About a week later, on May 14, defendant called the victim from jail. The victim testified that they apologized to each other for what happened. A recording and transcript of the call were subsequently presented to the jury. During the call, defendant explains that he "flipped out" because the victim would not agree to give him the camper shell and because she had been consoling another man. Defendant asks the victim whether she is "really pushing this," and the victim assures him that she did not want to press charges and that she has been the "opposite" of that.

A day or two after the jail call, the victim had a conversation with Deputy Rude and told him that she did not want to press charges. The victim also testified that she regretted calling the police "almost immediately" after she called 911. She testified that she felt pressured into prosecuting defendant and requesting the emergency protective order. She denied telling Deputy Rude that defendant (1) threatened to slit her throat; (2) threatened to kill everyone in the house; or that he (3) opened the knife and held it up to her face. She denied that her trial testimony was influenced by defendant's call from jail.

6

C.    *Michele's testimony*

Michele testified that she heard defendant arguing with the victim, saw the defendant throw the soda, and saw the victim push defendant down the hall. She testified that she followed them down the hall and saw defendant pin the victim against the wall.

Michele was asked about defendant's threats. She testified she did not personally hear defendant make any threats to the victim, but she heard *the victim* say that defendant had threatened to slit her throat, and she heard defendant tell the victim, "I will hurt you."

D.    *Investigator Horn's testimony*

Richard Horn, an investigator from the district attorney's office, interviewed the victim about the incident on May 17, 2019. The victim told Investigator Horn that she did not want to prosecute defendant. Investigator Horn testified that victims of domestic violence often change their statements to "minimize what actually happened to [them]." They sometimes say that they lied to law enforcement because they are embarrassed, or afraid, or for other reasons. He explained that just because they recant or change their statement does not mean the original statement to police was not true.

Investigator Horn also interviewed Michele. He testified that Michele told him that she saw defendant push the victim up against the wall. Horn testified that Michele "believed" defendant had a knife in his hand but she could not see it. Michele told him that she heard defendant threaten to slit the victim's throat.

On cross-examination, Investigator Horn was asked if he remembered having a conversation with someone in his office about trying to trick or "hornswoggle" the victim in some way. He said no. Defense counsel then played a recording of a voicemail message that Horn left for the victim. At the end of the message, Horn is heard saying: " 'You know, actually[,] he called her from the jail, and I'm trying to hornswoggle her into calling me so she can admit he called her from the jail. It violates the TRO.' " Horn testified that he had left a voicemail for the victim and did not properly hang up the

phone, allowing the machine to record his subsequent conversation with a coworker. He was not aware he was still being recorded.

E.  *Defense evidence*

Defendant presented no affirmative defense case. In argument to the jury, defense counsel conceded guilt as to count 3, but argued the prosecution failed to meet its burden of proof as to count 1. The defense noted that the case turned on credibility—in particular, the credibility of the responding officers' account of what happened as compared to the victim's account at trial. The defense's theory was that the victim's initial statement was exaggerated and/or coerced, and she subsequently changed her story because she had a guilty conscience.

F.  *Jury verdict and sentencing*

Defendant was charged in a three-count information with making criminal threats (§ 422—count 1); assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)—count 2); and misdemeanor disobeying a court order (§ 166, subd. (a)(4)—count 3). As to count 1, the information alleged that defendant personally used a knife within the meaning of section 12022, subdivision (b)(1). The information also alleged that defendant had two prior strike convictions (§ 667, subds. (b)-(i)); two prior serious felony enhancements (§ 667, subd. (a)(1)); and one prior prison term enhancement (§ 667.5, subd. (b)).

At the start of trial, the trial court granted the People's motion to dismiss count 2 in the interest of justice. The court also granted the People's motion to dismiss the prior prison term enhancement and defense counsel's motion to bifurcate the trial on the prior conviction allegations.

The jury found defendant guilty on counts 1 and 3, but found not true the allegation that defendant personally used a knife in the commission of count 1. Following the jury's verdict, defendant admitted the two prior strike convictions and two prior serious felony conviction allegations.

8

At sentencing, the court denied defendant's *Romero* motion to dismiss defendant's prior strike convictions and denied his motion to reduce the criminal threats conviction to a misdemeanor under section 17, subdivision (b). After considering the probation officer's report and recommendation, the court sentenced defendant to an aggregate term of 35 years to life, consisting of a third strike sentence of 25 years to life for count 1, plus five years for each prior serious felony enhancement. The court also imposed a concurrent 30-day jail sentence for count 3. Defendant filed a timely notice of appeal on October 26, 2020.

## DISCUSSION

### I

### *Sufficiency of the Evidence*

Defendant argues the evidence presented at trial was insufficient to support his conviction for criminal threats, in violation of his right to due process.

Because defendant has not raised any First Amendment arguments, we review defendant's sufficiency of the evidence challenge under the substantial evidence test. (*People v. Wilson* (2010) 186 Cal.App.4th 789, 805.) Under that standard, the defendant bears an "enormous burden" in demonstrating that the evidence does not support the findings. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) When considering a challenge to the sufficiency of the evidence, we do not reweigh evidence or reevaluate the witnesses' credibility. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 484.) We view the facts in the light most favorable to the judgment, resolving all conflicts in the evidence and drawing all reasonable inferences in support of the trier of fact's determination. (*Id.* at pp. 483-484.) We reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*Ibid.*)

The crime of criminal threats is set forth in section 422. That section provides, in relevant part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement,

9

made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison." (§ 422, subd. (a).)

In *People v. Toledo* (2001) 26 Cal.4th 221, our Supreme Court enumerated the five elements necessary to prove a violation of section 422. The prosecution must establish that: (1) the defendant willfully threatened to commit a crime which will result in death or great bodily injury to another person; (2) the defendant made the threat with the specific intent that it be taken as a threat, even if there was no intent of actually carrying it out; (3) the threat, on its face and under the circumstances in which it was made, was " 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat' "; (4) the threat actually caused the person threatened to be in " 'sustained fear for his or her own safety or for his or her immediate family's safety' "; and (5) the threatened person's fear was " 'reasonabl[e]' under the circumstances." (*Toledo, supra*, at pp. 227-228.)

Defendant challenges the findings with respect to two of the five elements, contending that the evidence is insufficient to establish that defendant made an "unconditional" threat, or that his threat caused the victim to be in "sustained fear." Neither argument is persuasive.

A.    *Unconditional threat*

Defendant contends the evidence is insufficient to support a finding under the third element of the offense, which requires that the threat be "so unequivocal, unconditional,

10

immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat." (§ 422, subd. (a).) Defendant's argument focuses on the victim's testimony at trial, and in particular, her statement on cross-examination that defendant told her, "If you don't stop putting your hands on me, I'm going to hurt you and your family." Defendant argues this testimony establishes that the defendant's threat was conditional. Defendant misconstrues the law and our standard of review.

In addressing a challenge to the sufficiency of the evidence supporting a conviction, we do not review the record looking for isolated bits of evidence that could support a contrary finding by the jury. Rather, we review the whole record in the light most favorable to the judgment to determine whether there is substantial evidence to support the finding made by the jury. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053; accord, *People v. Cuevas* (1995) 12 Cal.4th 252, 261.)

Here, there was substantial evidence to support a finding that defendant's threat was unconditional. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [the testimony of a single witness may be sufficient].) Deputies Rude and Isham both testified that the victim and Michele told them that defendant had threatened to cut the victim's throat. Although at trial Michele was unable to recall whether she heard defendant say he was going to slit the victim's throat, she recalled the victim telling her that defendant had made the threat. She also testified that she heard defendant tell the victim, "I will hurt you."

Although there was contrary testimony from the victim suggesting defendant's threat was conditional, it is not our role in reviewing the sufficiency of the evidence to reweigh the evidence or judge witness credibility. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.]" (*People v. Young, supra*, 34 Cal.4th at p. 1181; see also *People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*) [reversal unwarranted unless

11

it appears that upon no hypothesis is there sufficient substantial evidence to support the conviction].) Based on the testimony of the responding officers and Michele, a rational juror could have found that defendant's threat was unconditional.

In any event, section 422 does not require a fully unconditional threat. (*Bolin, supra*, 18 Cal.4th at pp. 338-339 [noting that most threats are conditional]; accord, *People v. Franz* (2001) 88 Cal.App.4th 1426, 1448.) Instead, it requires that "the threat must be 'so . . . unconditional . . . *as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution . . . .*' (§ 422, italics added.) 'The use of the word "so" indicates that unequivocality, unconditionality, immediacy and specificity are not absolutely mandated, but must be sufficiently present in the threat and surrounding circumstances to convey gravity of purpose and immediate prospect of execution to the victim.' [Citation.]" (*Bolin*, at pp. 339-340, original italics; accord, *In re George T.* (2004) 33 Cal.4th 620, 635; *People v. Wilson, supra*, 186 Cal.App.4th at p. 806.) In determining whether conditional language violates section 422, the trier of fact must consider the circumstances under which the threat was made, which may include how the defendant acted before, during, and after the threat, as well as the victim's knowledge of the defendant's prior conduct. (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137.)

Here, the circumstances surrounding defendant's threats are such that even if the threats were conditional, a rational juror still could have found that his threats were sufficiently unequivocal, unconditional, immediate, and specific as to reasonably cause the victim to fear for her own safety and the safety of her immediate family.

The defendant showed up at the victim's house uninvited, followed the victim inside even after the victim told him to leave, became angry when the victim refused to do what he wanted and threw a bottle against the wall. When the victim tried to get him to leave by pushing him down the hallway toward the front door, he pinned her against the wall and told her she better recognize who she was talking to. He then threatened to

12

puncture her tires when he was on the way back to his truck. The victim knew defendant had a knife at the time he threatened her.[2] She also knew that defendant previously had killed someone, and she was concerned enough about his criminal history that she ended their relationship because of it. The victim clearly took defendant's threats seriously, testifying that his threats made her "[v]ery upset" and "[v]ery scared." Deputy Rude likewise testified that the victim "was adamant that [defendant] was trying to kill her," prompting her to request an emergency protective order and to voluntarily sign a citizen's arrest form. Thus, on this record, there was substantial evidence to support a finding that defendant's threats were "so" unconditional as to convey "a gravity of purpose and an immediate prospect of execution of the threat." (§ 422, subd. (a).)

B.    *Sustained fear*

Defendant also contends the evidence is insufficient to support the jury's implied finding that defendant's threat placed the victim in "sustained fear." Again, we disagree.

Sustained, for purposes of section 422, means extending beyond what is momentary, fleeting, or transitory. (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) Decisional authority establishes that 15 minutes of fear is "more than sufficient" to constitute sustained fear. (*Ibid*.; *People v. Wilson* (2015) 234 Cal.App.4th 193, 197, 201; accord, *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1349 ["When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory' "]; see also *People v. Orloff* (2016) 2 Cal.App.5th 947, 951-954 [telephone death threat induced sustained fear].)

---

**2**    The not true finding on the allegation that defendant personally used a knife does not preclude finding a violation of section 422. Sufficiency-of-the-evidence review is independent of the jury's determination that evidence on another count was insufficient. (*People v. Brugman* (2021) 62 Cal.App.5th 608, 632-633, citing *People v. Lewis* (2001) 25 Cal.4th 610, 656.) Thus, in determining whether substantial evidence supports the finding of guilt for count 1, we are not bound by the jury's not true finding. (See *Brugman, supra*, at pp. 632-633.)

13

Here, there is substantial evidence to support a finding that the victim was in sustained fear. Even before defendant threatened her, the victim knew defendant previously killed someone, which made her concerned for her safety and the safety of her children. The victim testified that after defendant threatened her, she was "[v]ery upset" and "[v]ery scared." As soon as defendant went outside, she grabbed her phone and called 911. When Deputies Rude and Isham arrived about 10 minutes later, she told them that defendant had grabbed her by the throat, pinned her against the wall, and threatened to slit her throat and kill everyone who lived in the house. Although she appeared "calm" and "collected," Deputy Rude testified that her demeanor was not necessarily unusual. And he testified that she was "adamant that [defendant] was trying to kill her" and "afraid [for herself] and . . . her children." After taking the victim's statement, Deputy Rude discussed an emergency protective order to protect her and her children. She said she wanted one. She also voluntarily signed a citizen's arrest form. Given these facts, a rational juror could have found that defendant's threat placed the victim in a state of sustained fear.

Defendant contends the evidence does not support a finding of sustained fear because defendant had not been violent with or threatened the victim in the past; the victim allowed defendant to sleep on her couch after learning about defendant's criminal history; the victim admitted pushing the defendant down the hallway; the victim went outside her house after calling the police; the victim did not leave her house (or take other safety precautions) while waiting for the police to arrive; and because the victim was calm and collected when police arrived. But, again, the test on appeal is whether there is substantial evidence to support the finding of the trier of fact, not whether the appellate court is convinced the evidence proves defendant guilty beyond a reasonable doubt, or whether contrary evidence exists which could have supported a different conclusion by the jury. (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1372; *People v. Johnson* (1980) 26 Cal.3d 557, 576; *K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369, 1383, fn. 7.) A

14

conviction will be overturned only if, on the evidence presented, no reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Campbell, supra*, 51 Cal.App.5th at pp. 483-484.) Our review of the record in this case shows there is substantial evidence by which a reasonable jury could find that defendant made a criminal threat in violation of section 422. Accordingly, we affirm defendant's conviction for criminal threats.

## II

## Romero *Motion*

In addition to challenging the sufficiency of the evidence to support his conviction, defendant argues the trial court abused its discretion when it denied his *Romero* motion at sentencing. We find no abuse of discretion.

A.      *Additional history*

Prior to sentencing, defendant filed a *Romero* motion asking the court to dismiss his prior "strike" convictions for voluntary manslaughter (§ 192, subd. (a)) and for driving a vehicle under the influence and personally causing great bodily injury (Veh. Code, § 23153, subd. (a); § 12022.7). The prosecution opposed the motion, emphasizing the seriousness of the current offense, defendant's prior criminal history, and his disciplinary record while in custody at county jail. The trial court recognized its discretion to dismiss the prior strike convictions, but denied the motion, concluding that defendant did not fall outside the spirit of the Three Strikes law (§ 667, subds. (b)-(i)).

B.      *Analysis*

Our Supreme Court held in *Romero* that trial courts have discretion under section 1385 to dismiss a prior strike when a court finds a defendant falls, in whole or in part, outside the spirit of the Three Strikes law. (*Romero, supra*, 13 Cal.4th at pp. 529-530; *People v. Williams* (1998) 17 Cal.4th 148, 161 (*Williams*).) In deciding whether to exercise this discretion, the court must consider three factors: (1) the nature and circumstances of the defendant's present felonies; (2) the nature and circumstances of the

defendant's prior strikes; and (3) the particulars of the defendant's background, character, and prospects for the future.  (*Williams, supra*, at p. 161.)

A trial court's failure to dismiss a prior strike is subject to review under the deferential abuse of discretion standard.  (*People v. Carmony* (2004) 33 Cal.4th 367, 374 (*Carmony*).)  In reviewing for abuse of discretion, we are guided by two fundamental precepts:  (1) the burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary; and (2) it is not enough to show that reasonable people might disagree about whether to strike one or more prior convictions. (*Id*. at pp. 376-378.)

The scope of a court's discretion always is measured against the legal principles and policies governing the subject of its action.  (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297; *Carmony, supra*, 33 Cal.4th at p. 377.)  To this end, we are mindful that the Three Strikes law " 'was intended to restrict courts' discretion in sentencing repeat offenders.' "  (*Carmony*, at p. 377.)  It establishes a sentencing requirement to be applied in every case and "carefully circumscribes" the trial court's power to depart from it.  (*Ibid*.)  "In doing so, the law creates a strong presumption that any sentence that conforms to [the] sentencing norms [established by the Three Strikes law] is both rational and proper."  (*Id.* at p. 378.)

In light of this presumption, a trial court will abuse its discretion in failing to strike a prior felony conviction allegation only in limited circumstances, such as where the trial court was unaware of its discretion or considered impermissible factors in determining whether to dismiss or not dismiss a prior strike.  (*Carmony, supra*, 33 Cal.4th at p. 378.) But where the trial court, aware of its discretion, " 'balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law, we shall affirm the trial court's ruling, even if we might have ruled differently in the first instance.' "  (*Ibid*.) Only in "extraordinary" circumstances, "where no reasonable people could disagree that the criminal falls outside the spirit of the three strikes scheme," will a trial court's failure

16

to strike a prior conviction constitute an abuse of discretion. (*Ibid.*; *People v. Strong* (2001) 87 Cal.App.4th 328, 338, 343.)

The record shows that the trial court considered the relevant factors described in *Williams, supra*, 17 Cal.4th at page 161, and reasonably applied them to the facts.

In considering the circumstances and nature of the current offenses, the trial court acknowledged that defendant's section 422 conviction, while perhaps not as egregious as defendant's prior strikes, nevertheless was a serious offense involving a threat to slit the victim's throat and kill her family—a threat which she took seriously because of defendant's prior manslaughter conviction. The court also remarked that the threat occurred after defendant had been told to leave the residence and at a time when he already had exhibited other acts of aggression. Although the jury did not find true the allegation that defendant used a knife in the commission of the offense, the court noted that the evidence established defendant had a knife in his possession.[3] The court also noted that the victim's testimony at trial regarding defendant's use of the knife differed from what she initially indicated to law enforcement, and the court found it "interesting" that her story changed shortly after defendant violated the emergency protective order by calling her from jail. The court also commented on the fact that defendant used another inmate's information to complete the jail call, showing that defendant intended to violate the order and jail protocol.

The court also considered the length and severity of defendant's criminal history, which began in 1994, at age 18, when defendant was convicted for misdemeanor assault with a deadly weapon, for which defendant received 45 days in jail and 36 months' probation. In 1997, while still on probation for the first offense, defendant was convicted

---

[3]    The trial court did not err in relying on defendant's possession of the knife in considering the circumstances of the offense. (See *In re Coley* (2012) 55 Cal.4th 524, 554-560.)

17

of voluntary manslaughter, for which he received an 11-year prison sentence. In 2009, defendant was convicted of driving under the influence causing great bodily injury, for which he was sentenced to seven years in prison. In 2017, defendant violated his parole. Then, in 2019, he committed the underlying offenses. The court emphasized that defendant has not been "free of prison custody for a period of five years in his entire adult life."

Regarding defendant's background, character, and future prospects, the court found that defendant failed to provide the court with any relevant information. When the probation officer attempted to interview defendant to gather information, defendant refused to cooperate and "could not be bothered." Defendant "tore up and threw away the personal history packet that was . . . provided to him." As a result, the court had nothing to consider. (*People v. Lee* (2008) 161 Cal.App.4th 124, 129 [defendant's failure to present evidence about background, character, or prospects forfeits the right to complain that the court did not take such evidence into account].) For all these reasons, the court declined to exercise its discretion to dismiss either of defendant's prior strike convictions.

Defendant argues the trial court abused its discretion because his "entire felony record" consists of his two prior strike convictions, both of which were remote. But "older strike convictions do not deserve judicial forgiveness unless the defendant has used them as a pivot point for reforming his ways." (*People v. Mayfield* (2020) 50 Cal.App.5th 1096, 1107.) No such finding is possible here. There is no evidence that defendant has undertaken any efforts to reform his behavior. The gap between convictions is not significant because, as the trial court observed, defendant spent most of that time in prison. When not incarcerated, defendant has led a nearly continuous life of crime and demonstrated a general indifference to following the rules. He has performed poorly on probation and parole. One of his current offenses was committed while defendant was in custody awaiting trial, and the record shows that defendant also had

18

multiple disciplinary actions while housed at the jail. In addition, all his prior convictions involved crimes of violence.

In sum, given defendant's extensive criminal history, the age of his prior convictions was not a significant mitigating factor mandating that the court strike his prior convictions.[4] (See *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813; accord, *Williams, supra*, 17 Cal.4th at p. 163; *People v. Mayfield, supra*, 50 Cal.App.5th at pp. 1107-1109; *People v. Pearson* (2008) 165 Cal.App.4th 740, 749.)

Defendant also argues that it was an abuse of discretion not to strike at least one of defendant's prior convictions because, if sentenced as a second strike offender, defendant would still serve a "substantial" sentence. However, a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it. (*Carmony, supra*, 33 Cal.4th at p. 377.) If reasonable people might disagree, we may not substitute our judgment for that of the trial court, even if we might have ruled differently in the first instance. (*Id.* at p. 378.) On this record, we cannot say the circumstances presented by defendant are so "extraordinary" that no reasonable person could agree the sentence imposed was just.

### III

### *Fines and Fees*

A.     Dueñas

At sentencing, the court ordered defendant to pay a $2,000 restitution fine (§ 1202.4, subd. (b)), an $80 court operations assessment (§ 1465.8), and an $60 court

---

[4]     Defendant's reliance on *People v. Bishop* (1997) 56 Cal.App.4th 1245 is misplaced. The issue in *Bishop* was whether the trial court abused its discretion in *granting* a *Romero* motion by dismissing two of three prior strike convictions (all of which were 17 to 20 years old) before sentencing the defendant as a second strike offender for petty theft. (*Bishop, supra*, at pp. 1247-1248.) The issue here, in contrast, is whether the trial court abused its discretion in *denying* a *Romero* motion, and the current felony offense was much more serious than petty theft.

facilities assessment (Gov. Code, § 70373). In imposing the restitution fine, the court found that defendant had the ability to pay the fine out of prison earnings over the course of his confinement. Defense counsel did not object at sentencing. However, on January 15, 2021, defense counsel sent a letter asking the court to stay the restitution fine and strike the assessments on due process grounds under *Dueñas, supra*, 30 Cal.App.5th 1157. The court denied defendant's request without comment.

Defendant now contends the court erred in denying his *Dueñas* request. The People respond that defendant forfeited this contention by failing to raise a contemporaneous objection at sentencing. We agree.

Defendant was sentenced on August 28, 2020, well over a year after issuance of the *Dueñas* decision (*Dueñas, supra*, 30 Cal.App.5th 1157 [decided Jan. 8, 2019]), but he did not assert it, or assert his inability to pay the imposed fines and assessments. Filing a letter with the court approximately five months after sentencing, while the case was already on appeal, does not cure his failure to object at sentencing. (See *People v. Chlad* (1992) 6 Cal.App.4th 1719, 1725.) Therefore, we conclude that defendant forfeited his challenge to the restitution fine and assessments. (*People v. Scott* (1994) 9 Cal.4th 331, 351-353; *People v. Nelson* (2011) 51 Cal.4th 198, 227.)

B.     *Assembly Bill 1869*

At sentencing, the court ordered defendant to pay a $1,095 fee for the cost of the probation report (§ 1203.1b).

While this appeal was pending, the Legislature enacted Assembly Bill 1869, which repealed section 1203.1b, effective July 1, 2021. Assembly Bill 1869 also added a new section 1465.9, which provides: "(a) On and after July 1, 2021, the balance of any court-imposed costs pursuant to Section 987.4, subdivision (a) of Section 987.5, Sections 987.8, 1203, 1203.1e, 1203.016, 1203.018, 1203.1b, 1208.2, 1210.15, 3010.8, 4024.2, and 6266, . . . shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (§ 1465.9, subd. (a).)

Defendant argues that Assembly Bill 1869 retroactively applies to his case and therefore the court should strike the remaining unpaid balance of the probation report fee. The People do not dispute that Assembly Bill 1869 applies but argue that it is unnecessary for the court to strike it because, as of July 1, 2021, the fee is "automatically vacated" by the terms of the statute. We shall order the fee to be stricken.

Now that Assembly Bill 1869 is effective, it affects (or potentially affects) defendant in two ways. First, the balance of any probation report costs owed by defendant under section 1203.1b is unenforceable and uncollectible. (§ 1465.9, subd. (a); *People v. Clark* (2021) 67 Cal.App.5th 248, 259.) Second, the portion of the judgment imposing those probation report costs on defendant must be "vacated." (*Ibid*.)

Because Assembly Bill 1869 would require us to vacate a portion of a previously imposed sentence based on an offense committed before the effective date of the new law, we must decide whether the new law applies under the reasoning of *In re Estrada* (1965) 63 Cal.2d 740. We conclude that it does. By its plain language, Assembly Bill 1869 is an ameliorative change in the law intended to apply to every case (to which it constitutionally can be applied), effective July 1, 2021. (*People v. Clark, supra*, 67 Cal.App.5th at pp. 259, 260-261.) Because the judgment against defendant is not yet final, the new law can be applied to defendant's case. (*People v. McKenzie* (2020) 9 Cal.5th 40, 46 [discussing when case is final for purposes of *Estrada*]; *People v. Esquivel* (2021) 11 Cal.5th 671, 678-680 [same].) Therefore, the portion of the judgment imposing the probation report fee must be stricken.[5]

## DISPOSITION

The judgment is modified to strike the probation report fee imposed under section 1203.1b. Except as so modified, the judgment is affirmed. The trial court is directed to

---

[5] We note, however, that this ruling shall not have any effect on amounts collected prior to July 1, 2021.

prepare an amended abstract of judgment and provide a certified copy to the Department of Corrections and Rehabilitation.

                                                        KRAUSE        , J.

We concur:

     RAYE           , P. J.

     MAURO         , J.